IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| JAMES DUNN and | ) | |
| MAURICE G. MIDDLETON | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | _____ |
| | ) | JURY TRIAL DEMANDED |
| CITY OF FORT WORTH, | ) | |
| JEFFREY HALSTEAD, individually | ) | |
| and in his official capacity of | ) | |
| Chief of Police of the | ) | |
| Fort Worth | ) | |
| Police Department, | ) | |
| | ) | |
| Defendants. | ) | |

## **PLAINTIFFS' ORIGINAL COMPLAINT AND JURY DEMAND**

Plaintiffs JAMES DUNN and MAURICE MIDDLETON, collectively "Plaintiffs" file this Amended Complaint and jury demand against Defendants CITY OF FORT WORTH ("Fort Worth"), JEFFREY HALSTEAD ("Halstead"), individually and in his official capacity of Chief of Police of the Fort Worth Police Department, alleging race discrimination, harassment, hostile work environment, and retaliation pursuant to (i) 42 U.S.C. §1981, (ii) Title VII of the Civil Rights Act of 1964, as amended, (iii) both prior statutes' anti-retaliation

regulations and (iv) under 42 U.S.C.§1983. For cause of action, Plaintiffs would show the Court as follows:

## I. PARTIES, JURISDICTION AND VENUE

1.      Dunne and Middleton are residents and citizens of Fort Worth, Tarrant County, Texas. Plaintiffs are African American and are protected by 42 U.S.C. §1981, §1983and Title VII. Plaintiffs were at all relevant times employees within the meaning of the applicable statutes and performed work for City of Fort Worth in Fort Worth, Texas during the time period giving rise to the claims in this litigation.

2.      Fort Worth is a municipality in Texas ("Fort Worth").

3.      Halstead was, at all times relevant to this action, the Chief of Police at the Fort Worth Police Department.

4.      This Court has jurisdiction to hear the merits of Plaintiffs' claims under 28 U.S.C.  §1331 and §1343(a). The court has original jurisdiction.

5.      A substantial part of the events or omissions giving rise to Plaintiffs' claims happened within the Northern District of Texas and venue is proper in this District under 28 U.S.C. §1391.

## VICARIOUS LIABILITY--RESPONDEAT SUPERIOR

6.      Whenever in this complaint it is alleged that the City of Fort Worth did

any act or thing, it is meant that City of Fort Worth's supervisors, agents, servants, employees or representatives did such act and/or that at that time such act was done, it was done with the full authorization or ratification of the City of Fort Worth or was done in the normal and routine course and scope of employment of the City of Fort Worth's supervisors, agents, servants, employees, or representatives.

7.      The acts of management including but not limited to Chief Jeffrey Halstead (non-African-American), were performed while in the employment of the City of Fort Worth, to further the City of Fort Worth's business, to accomplish the objective for which these supervisory employees were hired, and within the course and scope of that employment or within the authority delegated to these employees. Halstead was given supervisory authority over Plaintiffs. As such, Halstead was given complete day-to-day control over the work conditions, duties, and all other aspects of Plaintiffs' employment.

## II. EXHAUSTION OF ADMINISTRATIVE REMEDIES

8.      Plaintiffs each filed a Charge of Discrimination ("Charge") with the United States Equal Employment Opportunity Commission (hereinafter "EEOC") on or about May 1, 2015. In those Charges, Nos. 450- 2015-02302, 450-2015-02301, and any amendments and/or attachments thereto, Plaintiffs asserted that Defendants discriminated against them because of their race and retaliated against them for complaining about such discrimination.

After investigating Plaintiffs' Charges, the EEOC issued each Plaintiff a Right to Sue Letter dated May 1, 2015. Plaintiffs have exhausted their administrative remedies and file this suit within the statutory limitations period.

### III. FACTUAL BACKGROUND

9.      The Fort Worth Police Department ("FWPD") hired James Dunn on July 6, 1996 as a Police Officer.

10.     The Fort Worth Police Department ("FWPD") hired Maurice Middleton in October 1999 as a Police Officer.

11.     Sometime in July 2010, Plaintiff Dunn saw an offensive picture of Sgt. Ann Gates holding a noose around a snowman's neck with a police cap on his head and a banana in his hand. As an African-American, Plaintiff Dunn was offended by the connotations that picture brought up. The picture was taken outside of 5000 MLK Freeway at the Traffic Enforcement Section.  Plaintiff Dunne filed a complaint with his Sergeant Delbert Johnson.

12.     Plaintiff Dunn's Sergeant, Delbert Johnson was also irate at the picture and explained to Dunn that he was filing a complaint as well and would take his and Dunn's complaint to Internal Affairs (IA).

13.     Plaintiff Middleton explained to Sergeant Delbert Johnson that he was offended by the snowman picture.

14.     Plaintiff Dunn was urged by other African American officers to let this go so that he doesn't get on the bad side of these white officers.  The white sergeants who were all involved wanted to talk with Plaintiff Dunn about the picture but Dunn refused and told them he was done with it. Dunne indicated that he made his complaint and didn't feel comfortable with Ann Gates being his Sergeant.

15.     Sometime after that, Lieutenant Boyd came to roll call and he says, "Hey there is some stuff going on. Some of you might've heard about it some of you might haven't but I'm just gonna put it out there. They're after Anne Gates." He continued that she is already in the drop; they're trying to force her out. Everybody's trying to get after her.  Lt. Boyd went further and said, "they found a picture of Anne and they're saying she's a racist now."  To Plaintiff's surprise Lt. Boyd said, "Yeah one of our officers, here, found it, I'm not gonna tell them your names but they found a picture and they're saying that she's a racist and we all know Anne's not a racist." And finally he said, "What's gonna happen is eternal affairs is gonna call you guys down there one by one and we're gonna tell them Anne is not a racist because we all know she lives an alternative lifestyle she's the last person that would be a racist." In essence, Lt. Boyd was telling all the officers what to say when called before the IAD to insure that Gates did not get into any trouble.

16.     Everyone in traffic is now pointing fingers at Plaintiff Dunn and Delbert Johnson and blaming them for trying to get Ann Gates fired and the environment becomes extremely hostile to the point that Plaintiff feared for his safety.

17.     The next day, Plaintiff Dunn was called into IAD by Sergeant Cedric Gutters.  First thing Sergeant Gutters said was man, tell me about this snowman. He pulled the picture out, he said, "It's been brought to my attention that you have been offended by this." Plaintiff responded that he was very offended by the picture.  Sergeant Gutters then asked Dunn what offended him about the picture and Dunn responded that any African American should be offended.

18.     Sergeant Gutter continued to ask benign questions, but Plaintiff Dunn stopped him and asked, if I'm telling you I am offended, what going to happen to Gates? Will she be transferred, fired or anything.  Sergeant Gutter explained that nothing probably going to happen to her. It's going to go on her file for six months then after six months it's like it never happened.  Plaintiff Dunn believed that his time was being wasted.  Three days later, Plaintiff returned to IAD to read over a draft of his complaint and confirmed that it was accurate and signed it.

19.     The next business day, Plaintiff Dunn gets a call from Sergeant Mike Shedd.  Dunn and Shedd sit down.  Dunne believed that they were going to talk about the complaint he made but instead, Shedd wanted to investigate Dunn about

a ticket audit.  Plaintiff Dunn explained that the investigators had already looked at his tickets and he had confirmed with Sergeant Delbert Johnson and Sergeant Mike Thorn that his tickets were fine.   In fact, Since Dunn was making a complaint, Sergeant Johnson checked to make sure cause he believed that they were going to come after Dunn for making the complaint so he wanted to make sure Dunn was clear.

20.      Shedd then told Dunn, "Yeah they have already been checked but we got an anonymous phone call by a female voice and we were told to go back and check your stuff again another time and we found some stuff… well we found one particular day we wanna talk to you about."   Plaintiff explained that the only reason he is down here is because two days ago he made a complaint and now y'all are coming after me.

21.      Shedd then told Plaintiff Dunn that it looks like he left early on March 4, 2010.  We think you falsified your tickets on that day and got paid.  Shedd then asked for a statement from Dunn.   Two days later Dunn Appeared with his statement written which reiterated that he worked and didn't leave early any day and particularly March 4, 2010.  Shedd accused Dunn of Talking to his lawyer and told Dunn there some guys in te other room that would like to speak with him. Plaintiff indicated that if you are not ordering me to speak with them then I am not going to.  They can read my statement.  Turns out that the guys in te other room

were with the task enforcement for the FBI.

22.     Two days later, Captain Sudan calls me and Sgt. Thorn to his office. Captain Sudan says that they have been notified that there are problems with Dunn's tickets and to turn over his badge and he was placed on restrictive duty. This was not even a week after Dunn first complained about the snowman.

23.     Thorn reconfirmed that he checked Dunn's tickets and they were fine and he didn't find anything in Dunn's file. Mark Thorne and David Stamp didn't the ticket investigation and turned over their findings to the IA which turned it over to the FBI.  Dunn was ordered to work in the auto pound.

24.     Plaintiff Middleton was called down to IAD by Shedd and believed he was being brought down because of his complaint about the snowman.  Instead Shedd said he had issues with Middleton's tickets with the STEP program and particularly on February 26, which is Plaintiff's birthday. Shedd said this lady claimed that she didn't get a ticket on February 26. Middleton told Shedd that could've been one of my tickets that he left in my ticket book in the back and Middleton told him that he just turned it in. Shedd said, "well we don't think you worked that day."  Middleton told Shedd he knew he worked that day because it was his birthday and he had to work four extra hours because he got off at eight o'clock.  He worked from twelve in the afternoon till eight that night.

25.     Middleton explained that on the back of the ticket there is an affidavit,

it states that I wrote this ticket on this date and you sign the back and it says, "I swear, affirm, that this ticket was given on this date or this time." Middleton explained that he signs these and affirms the date and time of his tickets. Shedd then asked Middleton, "How come your tickets are anywhere between twenty minutes to forty minutes off?"  Middleton said it's because his car radio time is ahead and his watch is set ahead., "if you go in my car, my car radio timer is ahead. My watch is set ahead." Shedd said, "well, I don't believe you." Shedd said there are a bunch of tickets with no times on them.  Middleton asked if there was an affidavit on the backside and Shedd said there was.  Middleton then asked, what does his GPS tell you and Shedd said he checked the GPS and it said Middleton was where he said he was.  Then Middleton asked, then why am I here?   Shedd said because someone turned your name in that you were actually writing tickets when you should not have been writing tickets.

26.     Middleton went to IAD to turn in his statement.  Nothing was said to him for about a week.  Then Middleton's gun and badge was taken from him and he was placed on restrictive duty in Communications.

27.     Around December 15, 2010.  Dunn is called the Chief Halstead for a meeting.  Halstead says, "Well everybody is recommending indefinite Suspension (termination) so I'm going to have to go with the recommendation on indefinite. Plaintiff then told Halstead that that's strange because he looked in his calendar

and he even stopped Captain Sudan the same day that you guys are talking about how he left early on this March 4, 2010. Halstead asked what Dunn meant by saying he stopped the Captain.  Dunn explained that while working STEP on March 4, 2010,  he stopped Captain at 5:30pm that evening on his way home in his unmarked company car.  Halstead asked again, did you stop the Captain and Dunn explained that he did.   Halstead asked what was the Captain doing and Dunn explained that he was speeding.  Dunn didn't realize it was Captain Sudan when he stopped him until he walked up to the driver's side window.   Captain Sudan explained that he wasn't paying attention to his speed and he was sorry.  Dunn told the Captain okay and have a nice day.  Dunn had placed in his journal a notation that he stopped the Captain that day. Halstead told Dunne to hold on and he left the room for a while.  He comes back and tells Dunn that he was going to go ahead and go with the indefinite. Everyone is getting indefinite today.

28.      This same day, Middleton was also given an indefinite suspension.

29.      After Plaintiffs' were terminated, the Chief created a SOP for how to work the STEP program.  Before they only instructions were from word of mouth from other officers.  You write 4 tickets in an hour and there is a total of 16 tickets in 4 hours (Illegal Quota System).

30.      Plaintiffs appealed the decision the Chief made within 10 days of his decision to terminate them.  Six months later, in June 2011, Plaintiffs have an

arbitration hearing to get their jobs back. When Plaintiffs arrived at the hearing, they found out that the City has called Tarrant County DA David Lobingier and has pressed criminal charges on Plaintiffs, and the City explained to the hearing officer not go through with appeals because they are bringing criminal charges. Plaintiffs were then told that they cannot have a hearing until the criminal charges have been resolved.   The State indict Plaintiffs for Falsifying a Government Document.

31.     While this case is ongoing, Plaintiffs job appeal is on hold, the arbitration is on hold, and their TCLEOSE license is on hold.  Every six months the criminal case is rescheduled until January 2014 when the State dropped the charges.   During this long wait, Plaintiffs were told not to go to EEOC and wait by Chief Halstead that Plaintiffs were gonna get their jobs back.  There was even a meeting with Chief Halstead and the Black Police Officer Association, the Latino Police officer Association to discuss bringing Plaintiffs back to work but the Latino Police Officer Association failed to show and Chief Halstead got upset and walked away from the table and said he was done.

32.     In July 2014, Plaintiffs are back at arbitration and the City comes in and says that now the Feds are looking to pick up the cases and charge Plaintiffs federally.  Again, the arbitrator declines to hear the case until all criminal matters have been resolved.  On March 4, 2015, the statute of limitations ran out and the

Feds declined to file any charges.

33.     Prior to this, other non-African American Officers who were similarly situated to Plaintiffs were treated differently.   Under Chief Halstead regime, there were three white officers that were accused of tampering with government records. They were suppose to relieve each other of shifts, instead of relieving each other's shifts, one would work the whole day while the other ones would take off and have like a three or four day weekend.  The City demoted one and transferred the other. The one that they demoted, he said, "Don't fire me. I'll just take a demotion." So he offered to take a demotion.  There was a white female involved and nothing was done to her.  In that case, they each admitted there involvement.  The City should have submitted the facts of the case to the district Attorney's office; they each should have been indicted by an independent grand jury, and prosecuted by a Tarrant County prosecutor. However, the City treated these non-African American officers differently than it treated Plaintiffs.   In another example of disparate treatment under Chief Halstead, Scott Keenum, a white sergeant was performing a STEP program but its was for patrolling malls or some type of mall detail where you are suppose to go check the malls within a certain parameterand make sure no burglars are around.  Keenum's Lieutenant Rangel, found out the Keenum wasn't working the grant like he was suppose to be working the grant.  Keenum was suppose to be at the mall working at a certain time.  Instead, Keenum was over his

girl friend's apartment for those four hours. So Lieutenant Rangel followed him a couple of days and sure enough, Keenum never went to his post. So Rangel wrote it all up and took it to internal affairs for Keenum falsifying government documents. Keenum was getting paid for the STEP grant that he never worked. Chief Halstead found out about it and called a meeting with all the Lieutenants and Rangel and he said, "listen, we're going to sweep this under the rug, Keenum, I am going to transfer you to wherever, this is it. I don't want to hear this anymore. I don't want this repeated by anybody. And this stays in this office. It's done." Rangel was so upset that he told everyone what happened.  The City should have submitted the facts of the case to the district Attorney's office; Keenum should have been indicted by an independent grand jury, and prosecuted by a Tarrant County prosecutor. However, the City treated this white officer differently than it treated Plaintiffs. Lastly, Tahwana Zavala, a white female, committed a crime by falsifying her traffic tickets.  The same thing that Plaintiffs were wrongfully accused of.  She was a traffic officer, wasn't fired until several years after Plaintiffs.  She was having an affair with Dave Stamp who was in charge of the investigation in the ticket scandal.  Dave Stamp told her how to falsify her STEP tickets so she wouldn't get in trouble. Stamp told her to write her tickets a certain way and she would have to work it, just get paid for it.  It was later discovered, by Plaintiffs' lawyer Terry Porter not the FWPD, that there were eighty-three citations

where she did not work and got paid numerous amounts of money for it. Zavala was called her in and she confessed that she did it and Stamp told her she would get caught.  She admitted that Sergeant Stamp had been covering for her. They had been having an affair.  Zavala was eventually fired.  However, the City should have submitted the facts of the case to the district Attorney's office; Zavala should have been indicted by an independent grand jury, and prosecuted by a Tarrant County prosecutor just like what the City did to Plaintiffs. Instead, the City treated this non-African American officer differently than it treated Plaintiffs.

34.     To show how out of control the FWPD was a white police officer, Tim Fornash, went on FaceBook and referring to Mexicans as "Wetbacks" and blacks as "hood rats."  Chief Halstead came to Fornash's defense and nothing happened to him. At this point, the discriminatory and retaliatory actions of the FWPD were so out of control that the leaders of the Fort Worth Black Police Officers Association filed complaints alleging race-based discriminatory and retaliatory treatment and harassment by supervisory and senior level officers within the Department. Since the continuing pattern of harassment, discrimination, and retaliation continued unabated, Plaintiffs filed complaints with the Mayor and City Manager. Because all these grievances and complaints of discrimination had gone unaddressed within a timely manner, the City retained Coleman & Associates to perform an independent investigation of all of

these complaints.

35.     The City asked Coleman & Associates to identify the issues that created and/or were driving the allegations of race-based discriminatory treatment and harassment in the City of Fort Worth Police Department. The complaints alleged race-based discriminatory treatment and harassment by supervisory and senior level officers, and relevant Chain of Command members. Coleman's goal was to discover the facts and report them so that appropriate action can be recommended to create a wholesome, harassment-free work environment.

36.     The Coleman Report was released in August 2014. After a thorough investigation, Coleman found that under Chief Hallstead, the Department's highest-level policymaker, participated in making adverse employment decisions based on race and maintained a racially discriminatory atmosphere and under his regime that the FWPD had tolerated and allowed a hostile work environment over a three-year time period that was based in part on race and retaliation for Plaintiffs and other African American officer's prior complaints of race discrimination.   This was a highly publicized report that generated many news reports.

37.     Coleman interviewed 23 witnesses within the police department and reviewed documents, such as the policies, procedures, practices, and structure of

the general administration and leadership of the police department. Coleman wanted to determined if there were sufficient policies and procedures in place to safeguard against harassment and discrimination in the department.

38.    Based on its interviews, Coleman concluded that division supervisors and the Chain of Command did not fulfill their duties and responsibilities for immediately and promptly addressing a highly volatile situation between Sgt. Stamp and Sgt. Johnson, a situation created by racial animosity, and that the failure to act allowed the behavior to continue for nearly three years. Coleman concluded that there was widespread knowledge of the situation involving Sgt. Stamp and Sgt. Johnson, but no efforts to manage the situation were made.

39.    Coleman's investigation revealed that Sgt. Stamp, a white officer, had a far-reaching effect on the department and its members because people feared that Sgt. Stamp, a while police officer, was " untouchable," and that "he could make your life miserable." Sgt. Stamp was also accused of making denigrating statements about Black employees and supervisors.

40.    Coleman concluded from its interviews that there was a consistent theme that Plaintiffs and other black officers were repeatedly subjected to behavior that was hostile, carried out publically over a period of more than three years, and witnessed by higher and lower ranking officers who failed to

stop the hostile environment. The interviews indicated that intimidating behavior occurred with the knowledge of supervisors, other employees in the Traffic Division, and witnessed by higher and lower ranking officers.

41.    The Coleman report caused the extraordinary measure of Chief Halstead publicly apologizing for the racial and retaliatory animus that was so pervasive within the Department. In the apology video that was posted on YouTube, Chief Halstead admitted that black officers were discriminated against because of the color of their skin, stating that they "were disrespected and retaliated against because of their skin color."  This policy of discrimination caused the adverse actions suffered by Plaintiffs.

42.    Chief Halstead announced his resignation shortly after the Coleman report was released, and he resigned from the police department in January 2015.

43.    Coleman also determined that Chief Halstead, the City's former Police Chief and Clearly the Department's highest-level policymaker and decisionmaker,  was actively involved in the discrimination of black officers even ordered a white police officer to file a fraudulent complaint with Internal Affairs against black officers in retaliation for them speaking out against the discrimination that was pervasive within the department.  The discriminatory actions by Chief Halstead clearly go further than mere knowledge,

his actions were deliberate.  Chief Halstead maintained a racially discriminatory atmosphere within the FWPD that was broader than just with respect to Plaintiffs. Moreover, it was this policy of discrimination that caused the adverse actions suffered by Plaintiffs. Because of the complaints made by Plaintiffs about the discrimination and hostile work environment, Chief Halstead and others began to retaliate against Plaintiffs and creating a hostile work environment.

44.    The content of the plaintiffs' speech were reports of racial discrimination and harassment perpetrated on them and others.  The discrimination and subsequent retaliation escalated and came directly from Chief Halstead. They filed complaints with several entities.   It was widespread misbehavior in the department against a number of black officers. It involved grand reprisal schemes against a number of black officers that called into question the veracity of those who schemed including Chief Halstead. It dovetailed into a broader investigation into misconduct wherein an outside entity was hired to investigate.  That outside entity completed the Coleman Report, which spells out a number of racial and retaliatory incidents affecting the department as a whole. These men made claims to root out police corruption for the good of the department. The racial and retaliatory maltreatment complained about spilled over into the public sector.  In fact, Chief Halstead himself issued a very public statement about the going ons within the police department.

45.      The continuing race discrimination, harassment, and retaliation it has taken a severe emotional toll on Dunn and his family. D u n n  has lost countless hours of sleep, He lost hundreds of thousands of dollars and emotional and mental distress.

46.      The continuing race discrimination, harassment, and retaliation it has taken a severe emotional toll on Middleton and his family.  Middleton got very depressed and was clinically diagnosed with  major depression and anxiety. He gained a lot weight and at one point ballooned to over 300 pounds.  He is on several mediations because of the toll the mental and emotional stress has placed on his body.  He is unable to sleep and has been diagnosed a form of insomnia.  In addition, he has lost hundreds of thousands of dollars.

### IV. CAUSE OF ACTION: SECTION 1983 –
### RACE DISCRIMINATION, HARASSMENT,
### HOSTILE WORK ENVIRONMENT, AND RETALIATION

47.      Plaintiffs re-allege and incorporate the allegations in paragraphs 1-46 as if fully stated herein.

48.      All conditions precedent to the filing of this action has occurred or has been fulfilled.

49.      Plaintiffs were employees of Fort Worth.

50.     Plaintiffs plead that defendants, under color of statute, ordinance, regulation, custom, or usage, subjected, or caused to be subjected, Plaintiffs to the deprivation of their rights, privileges, and immunities secured by the constitution and laws. Plaintiffs plead that defendants additionally violated their civil rights as protected by 42 U.S.C. §1983 by retaliating and conspiring against them for exercising free speech.

51.     Section 1983 creates a cause of action against any person who, "under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws [of the United States.]"

52.     The retaliatory Internal Affairs investigations of Plaintiffs and other individuals were undertaken in bad faith pursuant to a custom, policy and practice of the City of Fort Worth, as determined by those with final policy making authority, then Chief Halstead.

53.     There was a pattern and policy of harassment, intimidation and discrimination by Defendants resulting from Plaintiffs' exercise of their constitutional rights, and the exercise of those rights was the motivating factor in Defendants' retaliatory acts.

54.    Defendants' conduct in retaliating against Plaintiffs for reporting the hostile working environment and discrimination taking place with the police force constitute action under color of state law.

55.    Defendants, by operation of its customs, policy statements, ordinances, regulations, or decisions, permits, tolerates, and encourages a workplace atmosphere where free speech rights are disfavored and suppressed.

56.    Defendants willfully discriminated, harassed, created and tolerated a hostile work environment, and retaliated and/or conspired to retaliate  against Plaintiffs as described above.

57.    As a result of the unlawful discriminatory and retaliatory actions of Defendants as described above, Defendants have violated the provisions of Section 1983 in that acting under color of law, they, jointly and/or severally, deprived Plaintiffs of his rights, privileges, and/or immunities as provided by the Constitution of United States and its Laws.

58.    Defendants acted with intent to violate or with reckless indifference to Plaintiffs' clearly established rights under the First and Fourteenth Amendments.

59.    A reasonable person would have known he was violating Plaintiffs' constitutional rights.  Defendants knew or should have known that their conduct

deprived Plaintiffs of rights, privileges and immunities secured by the United States Constitution, including the right to freedom of speech and association. *See* U.S. CONST. amend. I.   Defendants' conduct was in violation of law clearly established during the time of the violation, which protects an employee's right to disclose government misconduct.

60.     Pleading in the alternative, Plaintiffs plead that defendants maintained a persistent, widespread practice by officials or employees that, although not authorized by officially adopted and promulgated policy, was so common and well settled that it constituted a custom and fairly represented municipal policy and that such persistent, widespread practice deprived them of their civil rights. Defendants, by operation of a persistent, widespread practice by officials or employees that, although not authorized by officially adopted and promulgated policy, was so common and well settled that it constituted a custom and fairly represented municipal policy, that permits, tolerates, and encourages a workplace atmosphere where free speech rights are disfavored and suppressed. The policy or custom was to allow discrimination of black officers without recourse as well as to allow retaliation of black officers who were willing to stand up against the rampant discrimination within the department and finally, to allow black officers to be treated disparately to white officers as described above.   It was based on these illegal policies that Plaintiffs were discriminated against by being treated

differently than white officers who were alleged to have done the same thing that Plaintiffs were alleged to have done under the same Chief of Police, Chief Halstead.

61.     Defendants' conducting of illegal and improper investigations and in retaliating against Plaintiffs for reporting discrimination within the department has caused and continues to cause severe emotional and physical injuries to Plaintiffs, including, but not limited to, mental anguish resulting from being the subjects of trumped up Internal Affairs investigations, Criminal charges, termination and loss of reputation in connection therewith, in violation of their constitutionally guaranteed rights.

62.     The above injuries are within the zone of interests sought to be protected by the First Amendment to the United States Constitution. Plaintiffs' injuries are directly traceable to Defendants' conduct. Defendants' conduct was intentional, malicious, willful and wanton, subjecting them to liability for punitive damages under Section 1983.

63.     Pursuant to 42 U.S.C. §1988 Plaintiffs also seek attorneys' fees, reasonable expert witness fees, and costs of the action.

### V.    CAUSE OF ACTION: SECTION 1981 AND TITLE VII– RACE HARASSMENT & DISCRIMINATION AND HOSTILE ENVIRONMENT PURSUANT TO 42 U.S.C. §1981 AND TITLE VII

64.     Plaintiffs re-allege and incorporate the allegations in paragraphs 1- 46 as if fully stated herein.

65.     Defendant Fort Worth, through its agents, supervisors, or employees violated Plaintiffs' civil rights in violation of 42 U.S.C. §1981 and Title VII, by intentionally interfering with Plaintiffs' performance of their employment because of their race.

66.     This intentional interference consisted of discrimination of a continuous nature.

67.     Plaintiffs, who are both black police officers, belong to a protected group. They were subjected to unwelcome harassment from their supervisors, and Chief Halstead himself due to their race and because they complained about racial inequality within the police department.

68.     Defendant Fort Worth through its agents, supervisors, or employees discriminated against Plaintiffs, which led to the loss and impairment in whole or part, of the wages, benefits, privileges, and terms and conditions of Plaintiffs' employment. The harassment Plaintiffs suffered was sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment.

69.     Chief Halstead and others in Plaintiffs' chain of command knew or should have known about the harassment and failed to take prompt remedial

action.

70.     The above-described acts of Defendant Fort Worth caused Plaintiffs substantial injury and damage.

71.     All conditions precedent to the filing of this action has occurred or has been fulfilled.

72.     Plaintiffs are employees of Fort Worth.

73.     Defendants willfully discriminated, harassed, created and tolerated a hostile work environment, and retaliated against Plaintiffs as described above.

74.     The City failed to provide equal protection for the black employees who dared verbalize disparate and harassing treatment.  The plaintiffs were treated differently from their counterparts who did not oppose discrimination.   Chief Halstead, the department's highest-level policymaker and decisionmaker, participated in making adverse employment decisions based on the plaintiffs' race. Furthermore, Chief Halstead participated in and condoned such Defendants acted with intent to violate or with reckless indifference to Plaintiffs' clearly established rights under the First and Fourteenth Amendments.

75.     Plaintiffs have suffered, and will continue to suffer, actual damages, compensatory damages, emotional distress, loss of reputation, and humiliation, for which they hereby seeks to recover.

76.     Plaintiffs also seek attorneys' fees, reasonable expert witness fees, and

costs of the action.

## V.  JURY DEMAND

77.     Plaintiffs hereby demand a jury trial on all issues, claims, actions, and

defenses in this case.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that Defendants be summoned to appear

and answer, and that on final trial, judgment be granted against Defendants,

jointly and severally, awarding Plaintiffs the following:

a.     Actual damages;

b.     Compensatory damages, including damages for emotional
distress, loss of reputation, and humiliation;

c.     Injunctive relief enjoining Defendants from engaging in
unlawful practices in violation of Title VII, Section 1983 and Section
1981;

d.     Prejudgment and post-judgment interest, in the maximum
amount allowed by law;

e.     Attorneys' fees, expert fees, and costs of suit; and

f.     Such other and further legal and equitable relief to which
Plaintiffs may be justly entitled.

Dated: July 30, 2015

Respectfully submitted,

By: /s/ Ray Jackson

**RAY JACKSON**
THE JACKSON LAW FIRM
SBN 00797754
1700 Pacific Ave., Suite 3890
Dallas, Texas  75201
214.651.6250 (Office)
214.651.6244 (Facsimile)
rjackson@jacksonfirm.net